IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 31, 2012 Session

## PRISCILLA LEE SLAGLE v. LAWRENCE FRED SLAGLE

**Appeal from the Probate and Family Court for Cumberland County**
**No. 17140     John R. Officer, Judge**

_____

**No. E2011-00785-COA-R3-CV-FILED-APRIL 30, 2012**

_____

This is a divorce case. The parties are Priscilla Lee Slagle ("Wife") and Lawrence Fred Slagle ("Husband"). They were married for more than thirty years and, prior to the entry of the divorce judgment, they shared the custody of their adopted grandson ("the Child"). Wife sued for divorce on the grounds of inappropriate marital conduct and irreconcilable differences. Husband filed a counterclaim on the same grounds. At a pre-trial hearing, the court held Husband in contempt for violating the statutorily-mandated[1] injunction prohibiting, among other things, the transferring of or the borrowing against "any marital property." Following the trial, the court additionally found Husband in contempt (1) for failing to comply with discovery requests and (2) for dissipating marital assets. Husband left the country and did not appear at trial. The court granted Wife a divorce predicated on Husband's inappropriate marital conduct; designated Wife as the Child's primary residential parent; and prohibited any contact between Husband and the Child until he had purged himself of contempt. The court classified and divided the parties' assets, awarded Wife $5,000 a month in alimony in futuro, and set Husband's child support obligation. Husband appeals. He challenges the contempt findings and some financial aspects of the court's decree. We reverse that part of the judgment barring contact between Husband and the child and downwardly adjust the award of alimony to $3,200 per month. In all other respects, the judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate and Family Court Reversed in Part and Modified in Part; Affirmed as Modified; Case Remanded with Instructions**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

_____

[1]*See* Tenn. Code Ann. § 36-4-106(d)(1)-(7) (2010).

Thomas F. Bloom, Nashville, Tennessee, for the appellant, Lawrence Fred Slagle.

Randal R. Boston and Kevin D. Poore, Crossville, Tennessee, for the appellee, Priscilla Lee Slagle.

## OPINION

### I.

Husband and Wife met in 1967, when Wife was 14 years old. They began dating and the following year their daughter Lisa was born. The parties established a home and married in 1980. In 2000, Lisa gave birth to the Child – a son named Jesse. Wife testified that a few months after the Child was born, Lisa began suffering from depression and became disabled and was unable to care for the Child. As a result, Husband and Wife adopted the Child and have raised him since infancy. At the time of trial, Husband was 67, Wife was 57, and the Child was 10. In addition to Wife and the Child, both Wife's elderly mother and the parties' daughter, Lisa, were living with the parties. We will now summarize the operative facts and the testimony presented in the proceedings below. It should be remembered that, because Husband did not appear at the December 2010 trial, his testimony is limited to that given by him at the August 2009 contempt hearing.

Husband worked in the travel and resort development businesses. For 21 years, throughout the 1970s and at the beginning of the marriage, he worked for a development company called Fairfield Communities located in Virginia. In the late 1980s, Husband and Wife relocated to Crossville. They later left and returned there more than once, while Husband pursued business ventures outside the country. In all, Husband worked in South Africa for eight years and on St. Maarten Island for three years. In 2004, Husband established his company, "World Vacations," a member-managed corporation with Husband as the sole member. At the time of trial, it continued to be active under the name of "Universal Dreams, NV." In addition, Husband established another business, "Marine Vacations." Wife testified that he subsequently sold it in 2006 for $500,000.[2] Wife had kept the company's books and said all of the earnings from Husband's business ventures were deposited into bank accounts in the United States. Husband agreed that in 2005 and 2006, he began taking Wife's name off of the parties' joint accounts and placing them in his name alone. He also closed other accounts. At the time of trial, Husband held an account at an offshore bank on St. Maarten.

---

[2]Few details regarding the company were provided and its relationship, if any, with World Vacations is unclear from the record before us; some testimony indicates that it was "World Vacations" that Husband sold and later regained.

At the time of the marriage, Wife had her GED and also worked for Fairfield Communities. After the marriage, she began college; she graduated with a business degree in 1985 and became a certified public accountant. While in Virginia, Wife worked, but left her job when the parties moved to Crossville. From that time on, Wife worked intermittently, repeatedly leaving her employment every few years, at Husband's request, to help him with his foreign business ventures. For a time, she worked in Crossville for MasterCorp, earning over $30,000 a year. This was her best-paying position. She was there until 1996, when the parties returned to South Africa. Later, Wife worked for Crossville Realty, in which Husband had an interest, and for a local CPA's office. In 2003, the parties moved to St. Maarten and Wife worked, without pay, for Husband's company, until she decided to end the marriage. According to Wife, she maintained her CPA license until 2004, when Husband told her she would not need to work anymore and didn't need to keep her license. Wife testified that her license is in an inactive status, and that reactivation required her to complete 80 hours of continuing education classes at a cost of $2,500. Wife said she did not have the necessary funds and had been unable to find a job with an employer who would pay the reactivation fees for her.

Wife testified that in 2006 the marriage was especially strained. By April 2007, the situation became worse and Wife felt that she and the Child needed to leave Husband. That month, Wife said things were "strange." Husband had been shredding many documents and became "real agitated" when Wife refused to sign their tax return. She suggested that they have everything appraised, split it 50/50, and go their separate ways. Wife said Husband responded by telling her that she would die "an old lonely penniless bitch" and threatened her that "you're not going to get one damn red cent. I will blow your damn ass away." Wife said this "was it," and two weeks later she left with the Child while Husband was out of the country.

On April 28, 2007, Wife called Husband in St. Maarten and told him she was divorcing him. Husband scheduled a return to Crossville the following day only to find that Wife and the Child had left the marital home. When Wife left, she removed $16,000 in cash and a $12,000 check made out to her from a safe of property. Husband met with an attorney that same day. Wife filed her complaint, accompanied by the standard injunction, on April 30, 2007. The return of service is not included in the record, but other evidence indicates that Husband was served on May 3, 2007. Beginning the following day, Husband started to engage in transactions involving marital funds held in various business and personal accounts and other marital property that later led the trial court to hold him in contempt for dissipation of marital assets in willful violation of the temporary injunction.

The proof shows that on May 1, after meeting with his attorney, Husband cashed a CD in the Child's name for $72,973.24. On May 4, 2007, Husband withdrew $110,000 from his

company's account, leaving a balance of $484, and another $15,000 from a personal checking account at U.S. Bank, leaving a balance of $5,215. That same day, he also obtained a loan from U.S. Bank for $200,150 secured by a money market account at the bank. On May 7, Husband obtained a $200,000 loan from Progressive Bank, this loan secured with two certificates of deposit. The first loan stated a purpose of "other," while the second stated "consumer business start up costs;" both loans were repaid within two months with the CDs and money market funds that had been securing them. On or about July 18, Husband transferred $248,506.44 held in a U.S. Bank IRA to "Lincoln Financial FBO Fred Slagle" to open a new retirement annuity.

According to Husband's testimony at the hearing in August 2010, the proceeds from the May 2007 loans, the Child's CD, and additional funds – totaling over $500,000 in all – were expended in a " bad investment" and lost. He said he was the managing partner of a joint venture in which he invested the money with the partners who had earlier purchased his World Vacations company. Husband said he was unable to run the business because of the divorce proceedings, and his partners backed out of the venture but kept his money. Husband said that because he had been a faithful investor, the partners had since decided to return the World Vacations business to him in compensation for his losses. Husband had no documentation for the bad investment he supposedly made, explaining that "these people deal in cash." Questioned regarding the timing of the deal, Husband said that the negotiations lasted over a year before the partners met in February 2007 and again in April 2007 and "from there it all blew up." Husband agreed that only $30,000 of the money he lost was paid before the divorce was filed; the remaining funds that he obtained in May 2007 were later picked up by his partners' representatives. Asked to name the persons to whom he gave the money, Husband repeatedly exercised his 5th Amendment right against self-incrimination.

Husband stated his current monthly income was $3,700 a month; this included his social security and annuity income of $2,800 a month and $900 a month in social security benefits for the Child. In addition to child support, Husband paid the Child's private school tuition and related expenses. He testified he had paid for clothing, dental and other expenses to "totally support [the Child] 100%." Husband last had physical contact with the Child in September 2009. Mother acknowledged that Husband and the Child had expressed love for each other and said that she continued to allow the Child to communicate with Husband by telephone. She agreed that while she was the primary caregiver, Husband had been actively involved in the Child's life until he left the country in late 2009. Wife had no objection to Husband spending time with the Child but did express some concern about threats he had made about kidnaping the Child.

At the time of trial, Husband had not paid any pendente lite-ordered alimony for the past 14 months. Wife and Child lived in the paid-for marital home, a five-bedroom house in Crossville. The 2007 tax appraisal valued the home at $323,800, while a May 2010 court-ordered appraisal set the value at $260,000. Wife kept possession of the 2005 Toyota she drove, valued at $5,000, while Husband kept three other vehicles with an estimated combined value of $50,000.

Wife presented a list of her job-seeking activities since she filed for divorce. She had applied for 76 positions or employment agencies without success. She attributed her difficulty finding a job as an accountant to several factors including her age, lack of experience, and frequent, lengthy breaks in her employment. She could not foresee ever achieving the kind of income Husband had generated during the marriage or enjoying a similar lifestyle. Wife testified that she was "barely getting by" on the income of $2,116 that she received from social security and child support each month and had relied on credit cards, some of which had gone into collection. Her "minimum" monthly expenses totaled $2701, excluding health insurance for herself. Wife testified that she had some health issues, but nothing that prevented her from caring for the Child, her elderly mother, or the parties' grown daughter. Wife said that Husband had a heart attack in 2005, but underwent surgery and "got over that."

The trial court granted a divorce to Wife on the ground of Husband's inappropriate marital conduct and dismissed Husband's counterclaim. The trial court expressly found that Husband's conduct "caused anguish or distress to [Wife] . . . that rendered continued cohabitation improper, intolerable, or unacceptable." Further, the court made Wife the primary residential parent of the Child, set Husband's child support obligation at $1,434.50 per month, awarded Wife alimony in futuro of $5,000 per month, and equally divided the parties' assets, which the court valued at approximately $2.2 million. Wife was awarded the marital home, its contents, and certain other specific assets. Included in its valuation of assets was roughly $600,000 the court found Husband dissipated after the complaint was filed and over $776,000 in deposits to his business and personal bank accounts over a four-year period leading up to the trial. In addition, the court ordered Husband to pay Wife's legal fees in the amount of $73,000 out of his half of the marital assets, and awarded Wife a judgment for past due alimony in the amount of $14,000. After awarding Wife $327,508.50 in specific marital property, the court awarded Wife an additional $722,491.50, representing the balance of her one-half share of the marital estate.

Pertinent provisions of the final decree are as follows:

> As to parenting of the parties['] minor [C]hild . . . until such
> time as [Husband] has reappeared and shown evidence of his

parenting skills, accepted his obligations in this litigation, and especially dispelled the risk that he would remove the [C]hild from the jurisdiction of this court in the manner that he has removed himself, he shall have no parenting time with the [C]hild and this decree shall enjoin him from having any contact with the [C]hild.

* * *

The child support amount pursuant to the child support guidelines would be $1,737 per month. [Husband], after the deviation of $312.50 per month would owe unto [Wife] $1,434.50 in child support per month.

* * *

[Wife] shall be granted permanent alimony in the amount of $5,000 per month. The payments shall be retroactive to January 1, 2011 and shall begin immediately.

* * *

The total assets of the parties set forth in the finding of facts (APPROXIMATELY $2.2 million) shall be divided equally, subject to a reduction of [Husband's] portion by the alimony, support obligation, attorney fee obligations, etc, which have accrued and been previously mentioned . . . .

All legal fees incurred by [Wife] in the amount of $73,000 shall be paid by [Husband] out of his one half of the marital assets awarded to him.

[Wife] is additionally awarded a judgment for past due temporary alimony in the amount of $14,000 . . . against [Husband] out of his portion of the marital assets awarded to him . . . .

[Wife] is *specifically* awarded the parties['] marital home at . . . Crossville, Tennessee. . . .

All the right, title and interest in the marital home is divested out of [Husband] and vested into [Wife] as separate property of [Wife] as distribution of marital property. The property was appraised at $260,000 . . . in 2010 and that is the amount credited to [Wife's] one half of the marital assets.

All other identifiable assets, specifically including the World Vacations bank account ending in 7121 ($36,650.95 as of October 31, 2010) and the US bank account ending in 7522 ($4,638.05 as of November 5, 2010) are awarded to [Wife]. If the funds in those accounts no longer exist, then [Wife] shall be awarded a judgment in the amount of $41,289. . . .

[Wife] is further awarded all property at the marital home and residence including the Toyota Prius that she is currently driving.

[Wife] has been specifically awarded $327,508.50 in marital property and the total marital assets proven were approximately $2.2 million[].

Therefore, [Wife] is additionally awarded a judgment of $772,491.50 against [Husband] for which execution may issue.

[Husband] shall pay and save harmless [Wife] from all marital debts.

[Husband's] conduct in this manner has been reprehensible and the prior ruling of this court holding [Husband] in contempt remains in effect.

(Capitalization and emphasis in original).

Husband timely filed a notice of appeal. He does not contest the granting of the divorce to Wife, but does challenge the classification of certain property, the calculation of his child support obligation, and the award of alimony in futuro as well as the finding of contempt and resulting punishment.

II.

Husband presents issues for our review that we restate as follows:

> 1. The trial court abused its discretion in holding Husband in contempt and banning contact with the Child as punishment.
>
> 2. The trial court erred in its classification of marital property.
>
> 3. The trial court abused its discretion in awarding Wife alimony in futuro.
>
> 4. The trial court erred in its calculation of Husband's monthly income for child support purposes.

III.

Our review is de novo; however, the record developed below comes to us accompanied by a presumption of the correctness of the trial court's findings, which presumption we must honor "unless the preponderance of the evidence is otherwise." Rule 13(d), T.R.A.P. The trial court's conclusions of law are not accorded the same deference. ***Adams v. Dean Roofing Co., Inc.***, 715 S.W.2d 341, 343 (Tenn. App. 1986). "Where the issue for decision depends on the determination of the credibility of witnesses, the trial court is the best judge of the credibility and its findings of credibility are entitled to great weight. This is true because the trial court alone has the opportunity to observe the appearance and the demeanor of the witnesses." ***Tenn-Tex Properties v. Brownell Electro***., 778 S.W.2d 423, 426 (Tenn. 1989).

IV.

A.

Husband's first two issues revolve around the trial court's order holding him in civil contempt for violating the temporary injunction mandated by statute. His contempt was based upon his obtaining of new "business" loans and paying them off with marital funds after the divorce was filed. In this regard, he contends that (1) Wife failed to prove that he was served with the injunction before the transactions at issue; and (2) the transactions were made in the ordinary course of Husband's business and fulfilled a commitment that pre-dated the filing of the complaint. In any event, Husband concludes that his actions cannot be deemed willful. Husband further submits that denying him all contact with the Child until

the contempt is purged violates Husband's constitutional rights, is unrelated to his offense, and is not a permitted form of punishment given the policy considerations favoring visitation between non-custodial parents and their children. In this section, we address these related issues in turn.

The Supreme Court has described civil contempt as follows:

> Civil contempt occurs when a person refuses or fails to comply with a court order and a contempt action is brought to enforce private rights. If imprisonment is ordered in a civil contempt case, it is remedial and coercive in character, designed to compel the contemnor to comply with the court's order. Compliance will result in immediate release from prison. Therefore, it has often been said that in a civil contempt case, the contemnor "carries the keys to his prison in his own pocket...."

*Black v. Blount*, 938 S.W.2d 394, 398 (Tenn. 1996) (internal citations omitted).

In the final decree, the trial court summarized the basis for its finding of contempt as follows:

### CONTEMPT

> Husband was ordered by the Court at the August 14, 2009 hearing to pay [Wife] $1,000 per month in temporary alimony beginning . . . September 1, 2009.
>
> Testimony of [Wife] indicated that [Husband] paid the temporary alimony in September and October 2009, but has failed to pay any alimony from November 2009 to the date of the final hearing on December 3, 2010.
>
> [Wife] is awarded a judgment for past due alimony in the amount of $14,000 . . . .
>
> [Husband] has violated the Court's Order regarding temporary alimony for fourteen consecutive months.

The Court[] previously found [Husband] to be in willful contempt of injunctions contained with [the] Divorce Complaint in May 2007, specifically the transfer of $498,154.81 in marital assets[,] after receiving the Summons of Complaint[,] in the previous Order . . . entered on September 22, 20[09][3]. An additional $110,000 was proven to have been taken by [Husband] at the December 3, 2010 hearing.

[Husband] was given the opportunity to purge himself of the willful contempt by depositing no less than $498,154.81 with the . . . Court . . . on or before October 15, 2009 or alternatively to turn himself into the . . . Justice Center . . . until such time that he tendered the amount withdrawn.

As of the . . . final hearing . . ., [Husband] has continued to be in contempt of the Court's September 2009 Order by failing to abide by the Court's Order to tender the funds or turn himself in . . . for incarceration. [Wife] asked for a finding of contempt for each and every day [Husband] has failed to comply with the Orders of the Court and for [Husband] to be punished accordingly.

[Husband] is also in contempt for failure to comply with the Requests to comply with discovery.

Several bank accounts belonging to [Husband] were subpoenaed, but only the two US Bank accounts that were entered in the record were provided by [Husband].

(Capitalization and bold type in original.) In addition, the court stated that its 2009 ruling "holding [Husband] in contempt remains in effect." That order provided that Husband "shall have no further visitation with the minor [C]hild prior to purging himself of willful contempt. . . . "

Based on the foregoing, the court further ordered:

---

[3]The trial court from time-to-time inadvertently referred to the year as 2010. We have corrected it throughout to reflect that the hearing was held in August 2009 and the order was entered in September 2009.

As to parenting of the parties['] minor [C]hild . . . until such time as [Husband] has reappeared and shown evidence of his parenting skills, accepted his obligations in this litigation, and especially dispelled the risk that he would remove the [C]hild from the jurisdiction of this court in the manner that he has removed himself, he shall have no parenting time with the [C]hild and this decree shall enjoin him from having any contact with the [C]hild.

*Konvalinka v. Chattanooga-Hamilton County Hosp. Auth*, 249 S.W.3d 346, 354-57

(Tenn. 2008), provides an extensive discussion of the courts' contempt power in the context

of disobedience of a court order. Therein, the Supreme Court observed:

The power to punish for contempt has long been regarded as essential to the protection and existence of the courts and the proper administration of justice.

\* \* \*

Tenn. Code Ann. § 16-1-103 (1994) currently provides that "[f]or the effectual exercise of its powers, every court is vested with the power to punish for contempt, as provided for in this code." To give effect to this power, Tenn.Code Ann. §§ 29-9-101 to -108 (2000) further define the scope of the contempt power and the punishment and remedies for contemptuous acts. Of particular relevance to this case, Tenn.Code Ann. § 29-9-102(3)specifically empowers the courts to use their contempt powers in circumstances involving "[t]he willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts." This provision enables the courts to maintain the integrity of their orders.

\* \* \*

Civil contempt claims based upon an alleged disobedience of a court order have four essential elements. First, the order alleged

to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

(Internal citations, headings and footnotes in original omitted).

Husband contends that his conduct was not willful. "The word 'willfully' has been characterized as a word of many meanings whose construction depends upon the context in which it appears. Most obviously, it differentiates between deliberate and unintended conduct." *Id*. at 357. Further, "[i]n the context of a civil contempt proceeding under Tenn.Code Ann. § 29-9-102(3), acting willfully does not require the same standard of culpability that is required in the criminal context. . . . Determining whether the violation of a court order was willful is a factual issue that is uniquely within the province of the finder-of-fact who will be able to view the witnesses and assess their credibility." *Id*. Husband first suggests that there is "some controversy" as to whether he carried out the disputed transactions before or after he was served with the complaint and injunction. In the trial court, Husband answered Wife's contempt petition with an allegation that he was not served until May 8, 2007. The return of service is not before us. Nevertheless, we are unpersuaded by Husband's effort to convince us that the several withdrawals and transfers of marital funds he carried out beginning on May 4 were without knowledge of the injunction put in place the day before. Husband's own testimony at the 2009 hearing, reasonably construed, is contrary to the argument he makes here:

> [Counsel]: You were actually served with the divorce papers on May 3, 2007?
>
> [Husband]: I would assume the record would show that, yes. I'm not entirely sure.
>
> [Counsel]: Whatever the record shows would be correct?
>
> [Husband]: [T]he last attorney, there was some controversy about when it was served. He never got to the bottom of it.
>
> [Counsel]: As far as you know the person who signed the paper and turned it in on May 3rd, that's when you were served; correct?

[Husband]: As far as I can say, yes.

\*     \*     \*

[Counsel]: And you are aware that there are certain injunction that attach immediately upon service of process of you with that Complaint, weren't you?

[Husband]: If I read it, yes.

Husband's testimony leaves little doubt that he was served, as Wife contends, on May 3, 2007. Absent the return of service, the best evidence supporting this conclusion, however, is before us. It is an itemized bill from Husband's attorney reflecting that Husband was billed for work on May 3, 2007 described as "[t]elephone call from client re: receipt of divorce complaint."

Husband's contention that the terms of the injunction were vague and ambiguous as to whether his actions were permissible is equally unpersuasive. The injunction provides in relevant part as follows:

> The parties are hereby restrained and enjoined from transferring, assigning, borrowing against, concealing or in any way dissipating or disposing, without the consent of the other party or an order of the court, of any marital property.

> Expenditures from current income to maintain the marital standard of living and the usual and ordinary costs of operating a business are not restricted by this injunction. Each party shall maintain records of all expenditures, copies of which shall be available to the other party upon request.

"A person may not be held in civil contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden. The order must, therefore, be clear, specific, and unambiguous." *Konvalinka,* 249 S.W.3d at 354. At the same time, contempt orders "need not be 'full of superfluous terms and specifications adequate to counter any flight of fancy a contemnor may imagine in order to declare it vague.' " *Id.* at 356. In the present case, we see nothing vague or ambiguous in the language

-13-

of the injunction. It simply states that divorcing parties may use current income to pay the "usual and ordinary" costs of operating a business. *See Armstrong v. Armstrong*, No. M2006-02713-COA-R3-CV, 2008 WL 624862 at *8 (Tenn. Ct. App. M.S., filed Mar. 5, 2008)(holding that Wife violated the temporary injunction by expending funds received from the sale of the marital home during the pendency of the divorce as "[t]hese monies were not 'current income,' but represented an asset of the parties."). Suffice it to say that Husband's conduct in unilaterally applying hundreds of thousands of dollars in marital assets to finance the "start-up costs" of a new business venture is an unreasonable, over broad interpretation. Moreover, Husband failed to maintain any records of his expenditures in connection with the purported "bad business investment" that he asserts was conducted entirely in cash and with persons whose identities he refused to divulge.

The evidence shows that Husband acted with deliberate speed to withdraw, transfer, and use, marital assets in direct violation of the temporary injunction. The trial court did not err in holding him in willful contempt and his argument to the contrary is disingenuous, at best.

B.

Next, Husband asserts that even if the finding of contempt is upheld, the punishment imposed is not appropriate. The power of the courts to enforce their judgments and decrees is well-established. The Supreme Court has observed that "there can be no doubt about the power and authority of this Court to take such action as it deems proper and appropriate to enforce its decrees and orders and to issue all necessary process to prevent interference therewith." *State ex rel. Stall v. Knoxville*, 211 Tenn. 428, 436 (1963). Stated otherwise, "[a] court's contempt powers can be used to compel obedience to its orders and to punish those who willfully disobey those orders." *City of Franklin v. Hunter*, No. M2007-02399-COA-R3-CV, 2009 WL 1260214 at *4 (Tenn. Ct. App., M.S., filed May 6, 2009).

In his brief, Husband admits that he fled the court's jurisdiction to avoid being jailed for contempt but insists he has not willfully abandoned the Child. He urges that the "only possible legitimate reason" to restrict his visitation in the present case is a fear that he may abscond with the Child. Citing public policy grounds that favor visitation between non-custodial parents and children, however, Husband basically argues that his conduct does not justify prohibiting contact with the Child altogether. On this point, we agree with Husband.

Custody and visitation determinations fall within the broad discretion of the trial court and will not generally be overturned absent a showing of abuse of such discretion. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). "In reviewing the trial court's visitation order

for an abuse of discretion, the child's welfare is given 'paramount consideration,' " **Suttles v. Suttles**, 748 S.W.2d 427, 429 (Tenn. 1988)(quoting **Luke v. Luke**, 651 S.W.2d 219, 221 (Tenn. 1983)), and "the right of the noncustodial parent to reasonable visitation is clearly favored." **Id**. Under similar circumstances to those in the present case, this Court has reversed an order banning contact between a parent held in criminal contempt for disobeying a court order and her minor child. *See **In re C.C.S.***, No. M2007-00842-COA-R3-JV, 2008 WL 5204428 (Tenn. Ct. App. M.S., filed Dec. 11, 2008). Therein, we concluded that, notwithstanding the court's power to punish a party for willful contempt, the "total suspension of mother's visitation was not the least drastic measure available" and was therefore unjustified. In reversing the trial court's judgment, we observed:

> While we do not condone Mother's behavior in violating the court's order, that violation, standing alone, is not sufficient to order all contact with the child be suspended. There is no proof in this record that Mother's conduct endangered the child's welfare, physically or emotionally, to the point where the presumption against denying her visitation rights was overcome. [T]he court must balance the right of Mother to visitation with the best interest of the child, as well as consider less restrictive alternatives.

**Id**. at * 23.

Returning to the present case, the trial court certainly has discretion to compel obedience to its orders by directing Husband to return the marital funds he took and put to his own use. At the same time, we remain mindful that "[c]ustody and visitation decisions are not intended to reward or punish parents, and visitation should not be granted or withheld for punitive purposes." **In re A.N.F.**, No. W2007-02122-COA-R3-PT, 2008 WL 4334712 at *18 (Tenn. Ct. App. W.S., filed Sept. 24, 2008). Based on the foregoing, we cannot sanction banning all contact between Husband and the Child as punishment for Husband's contemptuous behavior. Accordingly, we remand this matter to the trial court for the establishment of telephonic and such supervised visitation and/or other permissible face-to-face contact by Husband with the Child as determined to be appropriate in the court's discretion.

V.

A.

Husband contends that the trial court erred in its classification of the property in the marriage. He focuses specifically on two assets – the retirement annuity now with Lincoln Financial and the marital home.

Tenn. Code Ann. § 36-4-121(b) provides the following definitions relevant to the classification of property in a divorce:

> (1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date.
>
> (B) "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, and the value of vested and unvested pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage.
>
> (2) "Separate property" means:
>
> (A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts . . . .;

*    *    *

(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1).

B.

Regarding the retirement annuity, Husband asserts in his brief that he opened the account with pre-marital earnings and it increased in value during the marriage as a result of passive growth. As he sees it, "[b]y definition, this is the Husband's separate property." Husband's testimony and bank account statements show that the account had a "guaranteed value" of some $248,000, and generated monthly income of about $1,450 as reflected by monthly deposits into Husband's personal U.S. Bank account. By all indications, the annuity still existed at the time of trial.

The proof showed that the annuity was opened at Lincoln Financial in July 2007 with funds that Husband transferred from a traditional IRA formerly held at U.S. Bank. Husband asserts that "there is no material dispute that the . . . account . . . derived from his profit-sharing arrangement with Fairfield Communities between 1970 and 1980, prior to his marriage." Further, Husband continues, "Wife does not contradict this testimony. Instead, she testified to a profit-sharing plan which she could have participated in . . . started in 1979, a year prior to the parties' marriage." Our review of the evidence indicates otherwise.

Husband testified that the former IRA funds were received from his profit-sharing plan while employed with Fairfield Communities. When first questioned, he could not recall the amount he initially invested in the IRA; later in his testimony, he estimated it was $100,000. Husband agreed that the funds he transferred to open the annuity more than doubled during the marriage. Wife directly contradicted Husband's testimony that he earned the IRA funds before the marriage through a profit-sharing plan. She stated she worked in the accounting office at Fairfield Communities from 1976-80 and was familiar with the company's profit-sharing plan. She stated the plan did not start until 1979 and required five years of service from that year forward before an employee became fully vested, so that the funds with which he opened the IRA could not have been earned by Husband before the marriage. Wife's testimony on this point concerned only Husband; she made no reference to a different plan that became available to her with the same employer. Husband failed to produce any conclusive evidence regarding the retirement funds, thus leaving the trial court with nothing more than "he said, she said" testimony to consider.

Contrary to Husband's assertion, the parties' testimony certainly conflicted as to the source of the funds Husband initially used to establish his retirement account and when those funds were earned. In its decree, the trial court specifically included the annuity in the list

of "marital assets . . . proven to exist" at the time of the divorce, thus implicitly rejecting Husband's testimony and his "separate property" argument. "Where the issue for decision depends on the determination of the credibility of witnesses, the trial court is the best judge of the credibility and its findings are entitled to great weight. This is true because the trial court alone has the opportunity to observe the appearance and demeanor of the witnesses." *Tenn-Tex Properties v. Brownell-Electro*, 778 S.W.2d 423, 426 (Tenn.1989). The evidence does not preponderate against the trial court's finding that implicitly credited Wife's testimony to the effect that the annuity funds could not have been accumulated before the marriage. The trial court did not err in classifying the annuity as marital property.

C.

Turning to the marital home, Husband submits that this asset presents a "closer question" regarding its proper classification. The proof shows that, in 1978, Husband bought the land upon which the marital home was built and titled the deed in both parties' names. Husband asserts he hired workers from his small construction company to build the marital home. According to Husband, "the land was $21,000 at the time, and [he] spent about $200,000 in the initial building of the home." In the property division, the trial court classified the home as marital property, valued it at $260,000, pursuant to the most recent appraisal, and awarded it to Wife as part of the specific, identifiable assets she received.

Husband essentially concedes that the property was transmuted from separate to marital property when he titled it in both parties' names. As this Court explained in *Batson v. Batson*, 769 S.W.2d 849, 858 (Tenn. Ct. App. 1988),

> [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This may also be done by placing separate property in the names of both spouses.

As we further noted, "dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate." *Id*.

Generally speaking, property that has been properly classified as marital must then be equitably divided and distributed between the parties. *See* Tenn. Code Ann. § 36-4-121(a)(1). "Trial courts have wide latitude in fashioning an equitable division of marital property." *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994). Such a division must be accomplished with reference to the statutory factors found in Tenn. Code

Ann. § 36-4-121(c). Among those factors is the "estate of each party at the time of the marriage." Tenn. Code Ann. § 36-4-121(c) (7). "An equitable property division is not necessarily an equal one. It is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the unique facts of the case.*" Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). It is not necessary that both parties receive a share of each piece of property. *Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1990).

Despite acknowledging that the marital home in this case is presumed to be a gift to the marital estate, Husband urges us to find that he is entitled, "as a matter of law and equity," to a $221,000 credit for the monies he spent on the land and home prior to the parties' marriage. Thus, Husband's list of marital property includes the marital home at a value of $39,000, a figure he reached by deducting from the appraised value his initial costs. Under similar facts, this Court has rejected precisely the same line of reasoning as being based on a "false premise" that "incorrectly assumes that some part of the property to be divided in this case is separate property because Husband owned property at the time of the marriage." *Brock v. Brock*, 941 S.W.2d 896, 901 (Tenn. Ct. App. 1996). We further stated:

> Husband claims that these assets were his separate property because they fit within the definition of "separate property" found at T.C.A. § 36-4-121(b) (2) (A):
>
> > All real and personal property owned by a spouse before marriage.
>
> He argues from this that "the property division is inequitable because it did not provide him with a credit for [these assets]."
>
> We agree that the property in question falls within the definition of "separate property." We disagree with Husband's interpretation of the significance of this fact in this case.
>
> The definitions of "separate property" and "marital property" found at T.C.A. § 36-4-121 are for the purpose of aiding a court in properly classifying property owned by one or both of the parties at the time of their divorce. In the instant case, neither of the assets in question was owned by either of the parties at the time of the divorce. Those interests had been disposed of or otherwise liquidated at an earlier time. The property interests

represented by these assets were merged into the "wealth" of the marriage.

We are not aware of any authority, and counsel has not directed us to any, for the proposition that assets of a spouse at the time of marriage, but not owned by him or her at the time of the divorce, are to be carved out of the marital estate as separate property for the benefit of that spouse at the time of the divorce.

The appellant is not entitled to an automatic dollar-for-dollar credit against the marital estate for the value of property owned by him at the time of the marriage, but no longer owned by him at the time of the divorce. However, to the extent these interests were contributed by Husband to the wealth of the marriage, they are a proper matter to be considered in determining how the marital estate should be equitably divided.

*Id*. at 901. (Internal citations omitted). As in ***Brock***, we conclude that Husband is not entitled to a $221,000 credit for pre-marital funds he spent to purchase the land and build the marital home. Certainly, however, such contributions, are properly considered by the trial court in its *equitable division* of the marital property existing at the time of the divorce.

In summary, the evidence does not preponderate against the trial court's implicit finding that Husband's expenditures toward the marital home were transmuted into a marital asset subject to equitable distribution in the divorce. We note that although the trial court awarded this particular asset to Wife, it awarded one-half of the value of the total marital assets to each party. The evidence does not preponderate against the trial court's classification of the marital home and the court's determination that an equitable division in this case is an equal division of the marital estate. Husband is not entitled to a dollar-for-dollar credit for the funds he spent to acquire and improve the marital real property for the parties.

VI.

Husband next challenges the award of $5,000 a month in alimony in futuro to Wife. He reasons that this "case is a perfect example of where only transitional or rehabilitative alimony is warranted." He points to the fact that Wife is a certified public accountant who has worked in her field in the past. Husband emphasizes that after filing for divorce, Wife has chosen not to reactive her professional license and has yet to secure new employment that, as he sees it, would allow her to rehabilitate herself to a comfortable, self-sufficient level.

In deciding that Wife was entitled to spousal support, the trial court made extensive findings of fact. Among the more pertinent to our review are the following:

> [Husband] has been and apparently continues to be a successful entrepreneur and international businessman.
>
> [Wife] obtained a GED certificate and holds a Bachelor of Science Degree in business. . . .
>
> [Wife] has contributed her earnings to the marriage, and as a homemaker and stay at home mother, she has contributed to [Husband's increased earning power during the course of the marriage by working for certain business entities of [Husband] without pay.
>
> *   *   *
>
> [Wife] worked with [Husband's] company in St. Maarten without pay.
>
> [Husband] told [Wife] that she would not need to maintain her CPA license or work anymore when the parties had moved to St. Maarten.
>
> The parties had a long term marriage of 30 years and lived together since 1968.
>
> *   *   *
>
> The relative earning capacity of [Husband] far exceeds the relative earning capacity of [Wife] under even the best of circumstances.
>
> *   *   *
>
> [Wife's] testimony would indicate that the only separate property that she would have other tha[n] what she was awarded during this divorce would be the jewelry that . . . were gifts to her during the marriage of approximately $7,000.

[Wife] has never earned more than $35,000 per year.

[Husband] has the ability for future acquisition of capital assets and income through entrepreneurial opportunities, retirement account, and an ongoing basis through his employment while [Wife's] opportunity for future acquisitions is very limited.

* * *

It would be unclear as to what separate assets [Husband] would have as [Husband] continuously failed to abide by the Court's Order in providing discovery to [Wife], (specifically bank records).

The parties established a lavish standard of living during the marriage.

[Wife] also suffered economic detriment for the benefit of the marriage by foregoing her career at the request of [Husband] and in assisting [Husband] in various business ventures. . . .

* * *

[Wife] does not have any type of health or life insurance.

* * *

While the legislative preference is that a spouse who is economically disadvantaged relative to the other spouse, be rehabilitated whenever possible, in this case, rehabilitative alimony would not assist in bringing equity among the parties.

[Wife] needs and [Husband] has the ability [to] earn income to the extent that [Husband] is capable and able to pay alimony . . . in the amount of $5,000 per month in futuro.

Alimony in futuro is permissible in this matter as [Wife] is economically disadvantaged relative to [Husband] and full rehabilitation is not feasible.

An award of rehabilitative alimony would not place [Wife] anywhere near an equal footing with [Husband] nor would [Wife] be able to continue living in the manner in which she had become accustomed . . . during this thirty year marriage. An award of alimony in futuro will further assist her in this regard and provide[] her with "closing in" money.

[Wife's] . . . post-divorce standard of living should be "reasonably comparable to the parties' standard of living during the marriage.["]

[Wife] asked the court to award alimony in futuro in the amount of $5,000 per month until [her] death or remarriage. . . ."

As the court acknowledged, Tenn. Code Ann. § 36-5-121(d)(2005), the statute governing alimony, states a preference, "whenever possible," for an award of rehabilitative alimony to an economically disadvantaged spouse. However, "[where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, . . . then the court may grant an order for payment of support and maintenance on a long-term basis. . . ." *Id*. Thus, long-term spousal support is intended to provide long-term support to an economically disadvantaged spouse who is unable to be rehabilitated. *Burle v. Burle*, 40 S.W.3d 465, 471 (Tenn. 2004); *Lora v. Lora*, 952 S.W.2d 836, 838 (Tenn. Ct. App.1997). The amount, if any, and type of alimony to be awarded is within the sound discretion of the trial court in view of the particular circumstances of the case and a consideration of the relevant factors set forth in Tenn. Code Ann. § 36-5-121(I)(1-12).[4]

---

[4]The statutory factors are:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
(3) The duration of the marriage;
(4) The age and mental condition of each party;
(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(6) The extent to which it would be undesirable for a party to seek employment

(continued...)

Among the cited factors, the "real need of the [disadvantaged] spouse seeking the support is the single most important factor . . . [and next] the courts most often consider the ability of the obligor spouse to provide support." *Aaron v. Aaron*, 909 S.W.2d at 410.

Applying the relevant factors to the evidence before us, we reject Husband's contention that the trial court abused its discretion in awarding Wife alimony in futuro. In particular, we agree that economic rehabilitation of Wife to any significant extent is not feasible. Wife presented evidence of her persistent, ongoing search for employment with some 76 potential employers since the parties separated, without success. Even when her CPA license was active, Wife was able to earn, at best, some $30,000 a year in a job she held over 20 years ago. Presumably, Wife's limited experience, unstable employment history, and advancing age would make it most difficult, if not impossible, to achieve any semblance of financial independence or a standard of living comparable to that the parties' enjoyed during the marriage.

Notwithstanding our conclusion that alimony in futuro is warranted in this case, we conclude that the evidence preponderates against the *amount* of the award. Simply put, we discern no basis for awarding Wife $5,000 a month. Wife testified that the statement of expenses she provided was a true and accurate reflection of her current, average monthly expenses, excluding health insurance. The statement showed Wife's monthly expenses were $2,701. In our view, the award of $5,000 a month was based on little more than Wife's request for this amount. Accordingly, we modify the amount of the award of alimony in futuro to $3,200 a month to match Wife's stated expenses, plus $500 per month toward health insurance. Any award in excess of proven need is punitive and cannot stand. *See Duncan v. Duncan*, 686 S.W.2d 568, 571-72 (Tenn. Ct. App. 1984).

---

[4](...continued)
outside the home, because such party will be custodian of a minor child of the marriage;
(7) The separate assets of each party, both real and personal, tangible and intangible;
(8) The provisions made with regard to the marital property, as defined in § 36-4-121;
(9) The standard of living of the parties established during the marriage;
(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

VII.

Lastly, Husband asserts that the trial court erroneously calculated his income for purposes of calculating his child support obligation by averaging the gross deposits to his business account without deducting salaries, commissions and other business expenses. In unsupported, conclusory fashion, Husband argues in his brief that the method of calculation amounts to clear error and requests the case be remanded for reevaluation of his child support obligation.

The trial court calculated Husband's child support obligation as follows:

> [C]urrent child support shall be based on the following:
>
> [Wife] is the primary residential parent . . . and shall be credited with 365 days and [Husband] 0 days.
>
> [Husband's] income for child support purposes shall be set at $16,876.96 per month pursuant to the findings of fact and [Wife's] income shall be calculated at minimum wage for 40 hours per week.
>
> [Husband] shall be given credit on the child support worksheet for $312.50 per month for books, tuition, and activity fees paid for the . . . [C]hild as long as the [C]hild is attending private school.
>
> The child support amount pursuant to the child support guidelines would be $1,737 per month. [Husband], after the deviation of $312.50 per month would owe unto [Wife] $1,434.50 in child support per month.

The trial court calculated Husband's monthly income "by dividing the $766,340.04 in deposits over the past 46 months (January 2007 - October 2010) or $16,876.96 per month."

Husband testified at the earlier contempt hearing that he subsisted entirely on social security benefits and his retirement income of $1,450 a month. The only other evidence relevant to a determination of Husband's income came in the form of his bank statements, subpoenaed by Wife, showing monthly deposits to Husband's personal and business accounts at U.S. Bank. The statements reflect – in addition to the income as set forth herein which Husband acknowledged – frequent deposits in varying amounts from various sources in the

-25-

months before and since Wife filed for divorce. Husband argues that such deposits, alone, do not represent his actual, net income but he provided nothing to assist the court in this determination. In our view, the trial court properly relied on the limited evidence presented to establish Husband's child support obligation. The trial court cannot be faulted for not "deducting salaries, commissions and other business expenses" when the bank account statements were the only evidence provided by Husband. Since he was not at the trial, there was no evidence with respect to any alleged expenses.

The trial court did not err in calculating Husband's child support obligation. This issue is without merit.

## VIII.

The judgment of the trial court is reversed with respect to the provision prohibiting any contact by Husband with the Child until he had purged himself of his contempt of court. We remand this cause to the trial court for an order establishing telephonic and supervised visitation and/or some other form of face-to-face contact or communication with the Child by Husband under such terms and with such frequency as determined to be appropriate by the trial court in the exercise of its discretion. The award of alimony in futuro is modified to $3,200 per month. In all other respects, the judgment is affirmed. Costs on appeal are assessed against the appellant, Lawrence Fred Slagle.

_____
CHARLES D. SUSANO, JR., JUDGE